# 22-951 (L), 22-1076

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

CompassCare, a New York nonprofit corporation, National Institute of Family and Life Advocates, dba NIFLA, a Virginia corporation, and First Bible Baptist Church, a New York nonprofit corporation,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

Kathy Hochul, in her official capacity as the Governor of the State of New York, Roberta Reardon, in her official capacity as the Commissioner of the Labor Department of the State of New York, and Letitia James, in her official capacity as the Attorney General of the State of New York,

*Defendants-Appellees/Cross-Appellants.*

On Appeal from the United States District Court for the Northern District of New York, Case No. 1:19-cv-1409 (TJM/DJS)

**BRIEF OF APPELLANTS/CROSS-APPELLEES**

KEVIN H. THERIOT
JACOB P. WARNER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
ktheriot@ADFlegal.org
jwarner@ADFlegal.org

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Ste. 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

JAMES P. TRAINOR
TRAINOR LAW, PLLC
2452 US Route 9, Suite 203
Malta, NY 12020
(518) 899-9200
james@trainor-lawfirm.com

*Counsel for Appellants/Cross-Appellees*

**Appellants Request Oral Argument**

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants Compass Care and First Bible Baptist Church are nonprofit corporations organized under New York Law. Plaintiff-Appellant National Institute of Family and Life Advocates, doing business as NIFLA, is a nonprofit corporation organized under Virginia law. None of these corporations issue stock or have a parent company.

# TABLE OF CONTENTS

Corporate Disclosure Statement.................................................. i

Table of Authorities.............................................................iv

Jurisdiction....................................................................1

Issues Presented................................................................1

Introduction....................................................................3

Background......................................................................5

Argument Summary...............................................................14

Argument.......................................................................16

I.     Standard of Review .....................................................16

II.    Plaintiffs plausibly allege the Act violates their
       constitutional rights and deserve a preliminary injunction. ........16

       A.    Plaintiffs plausibly allege and will likely succeed in
             showing the Act compels expressive association.................17

             1.    Plaintiffs join with others to speak.............................18

             2.    The Act significantly affects Plaintiffs' ability to
                   promote their message....................................18

             3.    The Act fails strict scrutiny as applied........................21

       B.    Plaintiffs plausibly allege and will likely succeed in
             showing the Act violates free speech as applied.................25

             1.    The Act compels Plaintiffs to speak.............................25

             2.    The Act compels Plaintiffs' speech based on
                   content and viewpoint....................................27

3. The Act restricts Plaintiffs' speech based on content and viewpoint. ................................. 28

4. The Act fails strict scrutiny as applied. ....................... 29

C. Plaintiffs plausibly allege and will likely succeed in showing the Act violates free religious exercise. ................. 30

1. The Act unjustly intrudes on historically protected religious exercise. ......................................... 30

2. The Act targets people of faith. .................................... 31

3. The Act is not generally applicable. ............................ 32

4. The Act fails strict scrutiny. ....................................... 32

D. The remaining injunction factors favor Plaintiffs. ............... 33

III. This Court should order the requested injunction. ...................... 34

Conclusion ....................................................................................... 35

Certificate of Service ....................................................................... 37

Certificate of Compliance ................................................................ 38

# TABLE OF AUTHORITIES

## <u>Cases</u>

*A.H. v. French,*
    985 F.3d 165 (2d Cir. 2021) ............................................................ 16

*ACLU v. Clapper,*
    804 F.3d 617 (2d Cir. 2015) ............................................................ 16

*Bery v. City of New York,*
    97 F.3d 689 (2d Cir. 1996) ............................................................. 35

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ................................................. 17, 18, 19, 23

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011) ..................................................................... 24

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ..................................................................... 31

*Central Rabbinical Congress of United States & Canada v. New*
    *York City Department of Health & Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014) ............................................................ 29

*Christian Legal Society v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ........................................................... 24

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................. 24, 30, 31, 32

*Claybrooks v. American Broadcasting Companies, Inc.,*
    898 F. Supp. 2d 986 (M.D. Tenn. 2012) ......................................... 27

*CompassCare v. Cuomo,*
    465 F. Supp. 3d 122 (N.D.N.Y. 2020) ............................................ 13

*CompassCare v. Cuomo,*
    594 F. Supp. 3d 515 (N.D.N.Y. 2022) ............................................ 13

*Consolidated Edison Company of New York, Inc. v. Public Service Commission of New York*,
447 U.S. 530 (1980) ........................................................................ 23

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022) ........................................................ 22

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986) ...................................................................... 21

*E.E.O.C. v. KarenKim, Inc.*,
698 F.3d 92 (2d Cir. 2012) .......................................................... 16

*Elrod v. Burns*,
427 U.S. 347 (1976) ...................................................................... 35

*Employment Division, Department of Human Resources of Oregon v. Smith*,
494 U.S. 872 (1990) ................................................................ 30, 31

*English v. Town of Huntington*,
448 F.2d 319 (2d Cir. 1971) ........................................................ 34

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ............................................ 23, 31, 32, 33

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ...................................................................... 23

*Green v. Miss United States of America, LLC*,
52 F.4th 773 (9th Cir. 2022) ...................................................... 23

*Henry v. County of Nassau*,
6 F.4th 324 (2d Cir. 2021) .......................................................... 16

*Hobby Lobby Stores, Inc. v. Sebelius*,
723 F.3d 1114 (10th Cir. 2013) .................................................. 35

*Hurley v. Irish American Gay, Lesbian, & Bisexual Group of Boston*,
515 U.S. 557 (1995) .......................................................... 23, 25, 26

*International Dairy Foods Association v. Amestoy*,
  92 F.3d 67 (2d Cir. 1996)................................................................33

*Jacoby & Meyers, LLP v. Presiding Justices*,
  852 F.3d 178 (2d Cir. 2017).........................................................17

*Kaplan v. California*,
  413 U.S. 115 (1973) ......................................................................26

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) .................................................................30

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)..........................................................34

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
  138 S. Ct. 1719 (2018) ............................................................30, 32

*McDermott v. Ampersand Publishing, LLC*,
  593 F.3d 950 (9th Cir. 2010) ........................................................27

*Miami Herald Publishing Company v. Tornillo*,
  418 U.S. 241 (1974) ................................................................25, 28

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ......................................................................17

*National Institute of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) .................................................................26

*New Hope Family Services, Inc. v. Poole*,
  966 F.3d 145 (2d Cir. 2020)............................................19, 20, 26

*New York Progress & Protection PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013)......................................................33, 34

*Our Lady's Inn v. City of St. Louis*,
  349 F. Supp. 3d 805 (E.D. Mo. 2018) ...........................................23

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,
  475 U.S. 1 (1986) .............................................................26, 28, 34

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .......................................................... 29

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ............................................ 34

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ......................................................... 27

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ......................................... 17, 20, 21

*Rosenberger v. Rector & Visitors of University of Virginia*,
    515 U.S. 819 (1995) ......................................................... 28

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023) ................................... passim

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ............................................ 24, 29

*Tunick v. Safir*,
    209 F.3d 67 (2d Cir. 2000) .............................................. 33

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) ................................................. 23, 28

*Union Free School District No. 6 of Towns of Islip & Smithtown v.
    New York State Human Rights Appeal Board*,
    35 N.Y.2d 371 (1974) ....................................................... 25

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000) ................................................. 22, 23

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ......................................................... 25

## Statutes

28 U.S.C. § 1291 ........................................................................ 1

28 U.S.C. § 1292 ........................................................................ 1

28 U.S.C. § 1331 .................................................................1

28 U.S.C. § 1343 ................................................................1

N.Y. Exec. Law § 296.......................................................11

N.Y. Lab. Law § 203-e .................................................. passim

## Other Authorities

David E. Bernstein, *The Right of Expressive Association & Private Universities' Racial Preferences & Speech Codes*, 9 Wm. & Mary Bill Rts. J. 619 (2001) ..........................................22

Richard W. Garnett, *Jaycees Reconsidered: Judge Richard S. Arnold & the Freedom of Association*, 58 Ark. L. Rev. 587 (2005) .................................................................21

## Rules

Fed. R. App. P. 4(a)(1)-(3)...........................................1

## JURISDICTION

The district court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 and could grant the requested injunctive relief under 28 U.S.C. § 1343 because Plaintiffs raise First and Fourteenth Amendment claims. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292 because the district court issued an order partially dismissing Plaintiffs' complaint and denying their preliminary-injunction motion, later awarded Plaintiffs summary judgment on the surviving claim, and then entered final judgment on April 1, 2022. Plaintiffs timely filed their notice of appeal on April 28, 2022. JA413. Defendants timely cross-appealed on May 12, 2022. JA416; Fed. R. App. P. 4(a)(1)-(3).

## ISSUES PRESENTED

Plaintiffs-Appellants are nonprofits that exist to promote a common message: all human life is sacred. They promote biblical beliefs about life, sexuality, and marriage. And they hire only those who share and can credibly promote their beliefs. N.Y. Labor Law § 203-e forbids employers from making employment decisions based on a person's "reproductive" choices. It also forbids employers from requiring employees to sign "waivers or other documents" disclaiming this right. And it forces employers with employee handbooks to publish details on the Act. These rules apply to all employers. Violations trigger hefty penalties—costly lawsuits, damages, attorneys' fees and more. This presents four questions.

1.    N.Y. Labor Law § 203-e forces Plaintiffs to employ those who reject their beliefs and cannot credibly promote their message. Did Plaintiffs plausibly allege, and will they likely succeed in showing this violates their rights under the First Amendment to the U.S. Constitution?

2.    N.Y. Labor Law § 203-e forces Plaintiffs to notify employees in their employee handbook that reproductive choices will have no employment consequences. Did Plaintiffs plausibly allege, and will they likely succeed in showing this violates their rights under the First Amendment to the U.S. Constitution?

3.    N.Y. Labor Law § 203-e forbids Plaintiffs from requiring employees to waive their right to sue under the law. Did Plaintiffs plausibly allege, and will they likely succeed in showing this violates their rights under the First Amendment to the U.S. Constitution?

4.    The injunction record below is complete. Should this Court preliminarily enjoin N.Y. Labor Law § 203-e as applied?

## INTRODUCTION

Plaintiffs-Appellants are nonprofits striving to show all human life is sacred. They serve vulnerable women and unborn children, providing pregnancy care, pro-life counseling, parenting tips and more. They also care for families long after children are born. And their Christian faith fuels this mission. It's so critical that CompassCare Pregnancy Services, National Institute of Family and Life Advocates (NIFLA), and First Bible Baptist Church require all employees to share their faith so employees can credibly promote their lifesaving message. Their messengers must practice what they preach, or else their message will fail.

Plaintiffs must also keep their message consistent. If clients do not see Plaintiffs' message as constant, beautiful, and true, they will reject it. Yet N.Y. Labor Law § 203-e ("the Act") threatens to blunt their message. It forbids employers from making employment decisions based on their employees' "reproductive health" choices. It hijacks employers' handbooks, forcing them to promote the Act in branded resources. And it prevents employers from requiring employees to waive their right to sue under the Act. This cripples Plaintiffs' mission. It forces them to employ those who cannot credibly promote their message. Then it ensures they must advertise the State's cruelty and invite crushing lawsuits that threaten damages, injunctions, attorneys' fees, and more.

This intrusion is unconstitutional. To start, it compels Plaintiffs to associate with those who will impeach their message. It is akin to telling

3

Democrat candidates they must hire Republican strategists and social media influencers. The Act also compels Plaintiffs' speech, forcing them to promote in their employee handbooks the very message they oppose—that employees can have abortions, use abortifacient drugs, or reject biblical sexual ethics without consequence. In addition, the Act restricts speech, forbidding Plaintiffs from requiring employees to waive their rights to sue. And worse, it targets people of faith. Because the Act is not narrowly drawn to advance a compelling interest, the Act fails strict scrutiny as applied to Plaintiffs.

This Court should reverse the dismissal below. Plaintiffs plausibly allege the Act violates their First Amendment rights. What's more, they will likely succeed on the merits. And every day they face First Amendment injury, Plaintiffs and the public lose. New York has no interest in enforcing unconstitutional laws. Because no further record development is needed, this Court should reverse the dismissal below and preliminarily enjoin the Act as applied. It should enter the injunction itself or order the trial court to do so on remand. Plaintiffs need urgent relief.

# BACKGROUND

Plaintiffs-Appellants are nonprofits that aim to spread a common message: all human life is sacred. JA21, JA25-34, JA68. CompassCare Pregnancy Services is a faith-based pregnancy care provider based in Rochester, New York. JA23. It helps pregnant women by providing pregnancy testing, ultrasound exams, and pro-life counseling. JA25. These services empower women by helping them understand prenatal development, abortion procedures and risks, and alternatives. JA25. Because CompassCare believes every abortion destroys unborn human life, and that innocent life deserves protection, it cannot recommend, provide, or refer for abortions or abortifacient drugs and devices. JA26.

The organization's faith fuels this pro-life commitment. JA27. Per its mission statement, CompassCare is a "Christ-centered agency dedicated to empowering women and men to erase the need for abortion by transforming a woman's fear into confidence." JA27. It aims to convert communities into safe havens for life—places where abortion is no longer wanted. JA67. To fulfill this mission, the organization serves women facing unexpected pregnancies, inspires them to hope through challenge, and empowers them to choose life. JA27. CompassCare exists to promote one view: all human life is sacred. JA68. Advancing this view requires a team committed to showing life's beauty and worth. Words alone do not work. They must be verified by a life that proves them.

CompassCare requires all team members—whether staff, board members, or volunteers—to share its faith and values. JA28. Team members must support the organization's "religious mission, and personally conduct themselves with the Christian faith and belief that guides that mission." JA28. They must honor CompassCare's views "on abortion, birth control, religious faith, and organizational principles." JA28. Besides requiring orthodox Christian beliefs, this rule ensures that team members align with the organization's view on sex—that sex outside biblical marriage often leads to unexpected pregnancies, harmful diseases, and broken lives; and that "sexual abstinence, [not] contraception," is best. JA28. This rule is mission critical for CompassCare.

Mental assent alone is insufficient. CompassCare also requires its team members to practice what they preach—or in its words, to live "a life consistent with [the organization's] mission and … beliefs." JA69. As part of their work, team members must never encourage or "advise any woman to have an abortion," and they must "uphold the organization's" view on biblical sexuality, which includes abstinence for unmarried individuals. JA69. Outside work, team members themselves must not obtain abortions, not facilitate others' abortions, decline "abortifacient drugs or devices," stay "monogamous" if married, remain "sexually abstinent" if not, and pray for CompassCare. JA29, JA69. These rules ensure that CompassCare staff aligns on issues critical to their success.

They also promote credibility. The rules ensure that CompassCare can "spread an authentic message of love and hope," which encourages pregnant women to receive the organization's message "more readily" and will "save more lives" in return. JA29. The strategy's success has been remarkable. In 2018 alone, CompassCare saved 225 unborn lives—children whose mother had considered abortion but ultimately chose life "through the [faithful] efforts" of CompassCare team members. JA29. What's more, because CompassCare seeks to train other pregnancy centers to also care for women and unborn children, and to win them to pro-life views, JA29, its mission discipline is critical to promoting a powerful message and consistent message—one that is proven not by logic alone, but by its perceived beauty and worth to team members.

The same goes for NIFLA, a faith-based network of pregnancy centers committed to serving women and protecting unborn human life. JA30. NIFLA is a one-stop support hub. It offers legal support, hosts conferences, and provides educational resources that empower member-centers to fulfill their pro-life mission. JA30. The organization also helps pregnancy centers add clinical support and shows them how to best promote the pro-life message. JA30. NIFLA has 41 member-centers in New York. JA30. And because NIFLA advises these member-centers to adopt "statements of faith and codes of conduct" that ensure team unity, JA30, many member-centers run much like CompassCare—requiring employees to share the center's faith, including its Christian beliefs on life, sex,

contraceptives, and marriage. JA31. This shared identity is critical to promoting a consistent pro-life message. JA31, JA58, JA96, JA100.

These nonprofits do not work alone. They partner with churches like First Bible Baptist Church of Hilton, New York. First Bible has served its community for over 50 years. JA31-32. Like many churches, First Bible believes the Bible "is the inerrant Word of God and the final authority for human conduct." JA32. And it holds "orthodox Christian beliefs"—including the belief that human life is sacred, that it "begins at conception," that God forms human life, and that all human life "bears his image." JA32. As a result, First Bible believes that abortion "violates the Bible's commands" because it unjustly destroys "unborn human life." JA32. It also believes facilitating abortion is wrong. JA32. In all that the church does, First Bible seeks to "recognize and preserve" the sanctity of human life from conception to natural death. JA32.

These words lead to action. First Bible promotes its pro-life view "both internally and publicly." JA33. Outwardly, First Bible partners with CompassCare by providing supplies and monthly financial support. JA33. It likewise partners with two more pregnancy centers, Mission Lifesaver Ministries and Share Outreach Center. JA33. And it supports HIS Ministry, a foster care group that provides clothes, diapers, toys, gift cards, and more to new foster parents. JA33. As part of this support, First Bible provides respite care and mobilizes prayer teams to serve foster families. JA33. It does not matter whether these families attend First

Bible; the church seeks to bless *all* foster families and so validate, not just speak, its pro-life message—persistently caring for children both before and long after they are born. JA33.

This care extends to formal education and training. First Bible runs Northstar Christian Academy, which educates students from preschool through twelfth grade. JA34. Its educators provide "a distinctly Christian environment," teaching students "from a biblical worldview," encouraging them to follow Christ, and inculcating Christian beliefs, JA34—which include the beliefs "that every child is made in the image … of God," that abortion unjustly takes "innocent human life," and that sex is reserved for a married husband and wife, JA34. First Bible also runs Grace and Truth Athletics and Sports Park, through which it offers sports programs that teach teamwork, sports skills, and "positive Christian values." JA34. Both ministries follow First Bible's statement of faith. JA34. And they seek "to glorify God" in all that they do. JA34. Teaching and modeling the faith is critical to that mission. JA34-35, JA43, JA45, JA50.

First Bible's success requires full mission buy-in. Or as First Bible says, to fulfill its pro-life mission, the church's "messengers must *live out the message* [First Bible] aim[s] to communicate." JA106 (emphasis added). Its "messengers are the message." JA106. Indeed, they are "central" to the church's mission. JA106. So First Bible requires its pastors, directors, employees, and volunteers—anyone who ministers—to hold and follow the church's beliefs. JA33. The same goes for Academy and

Park ministers. JA34-35. First Bible employs no one who disagrees with its statement of faith or refuses to live consistently with its beliefs. JA34-35. So both at work and at home, ministers must follow First Bible's "teachings on human sexuality and abortion," which includes having no abortion nor facilitating one, and living consistently with a biblical sexual ethic. JA33, JA103. The church's mission depends on this.

The Act is an existential threat to Plaintiffs' pro-life missions. Passed in 2019, it forbids employers from "discriminat[ing]" or "tak[ing] any retaliatory personnel action against an employee … because of … the employee's or dependent's reproductive health decision making." N.Y. Lab. Law § 203-e(2)(a). In other words, the Act forces Plaintiffs to accommodate the very employee conduct—abortion—that Plaintiffs exist to prevent. The Act also forces employers to "include in [their employee] handbook [a] notice of employee rights and remedies under" the Act. N.Y. Lab. Law § 203-e(6). And it forbids Plaintiffs from requiring employees to "sign a waiver or other document" that "purports to deny" them "the right to make their own reproductive health" decisions. N.Y. Lab. Law § 203-e(2)(b). The Act's legislative history shows no instance of discrimination based on an employee's reproductive choices—whether in New York or anywhere else. JA36-37. But it does show the Act aims to punish people of faith. JA37-40. As one lawmaker said, the Act will stop religious employers from using "personal beliefs" to "encroach[ ]" on their employees' reproductive choices, JA19, JA122—i.e., it will mute employers' faith.

And so it does. The Act forces Plaintiffs to employ those who reject their beliefs, refuse to live by their code of conduct, and cannot credibly promote their views. JA42-43. This hijacks Plaintiffs' pro-life mission. Only a team of "likeminded individuals" can credibly "spread [Plaintiffs'] … message," JA29, express their "religious and pro-life view[s]," JA31, and promote "the sanctity of human life from conception until natural death," JA32. The Act forbids this. And while lawmakers knew the Act would dictate Plaintiffs' decisions and that better paths exist, they passed the Act with no religious exemption—unlike their custom when passing other employment laws. JA39; *e.g.* N.Y. Exec. Law § 296(1)(a), (11).

But this is no problem, said one lawmaker: religious employers benefit from the ministerial exemption; they can simply litigate the issue whenever it arises. JA40. That's a cruel sentiment. It's like saying the police can arrest whoever they want, whenever they want, because courts will sort it out later. It also punishes religious employers no matter how they fare in court. And while lawmakers recognized the First Amendment may protect churches and religious nonprofits (in part), JA40, the Act still punishes them for exercising their freedom—requiring them to risk court and its costs rather than run their ministry free from unjust threats. One misstep could sink them. The Act allows both state and private enforcement, which exposes employers to hefty damages, attorney fees, injunctions, and more. JA40-42; N.Y. Lab. Law § 203-e(3).

Forced to choose between shuttering their mission, ministry, or conscience, Plaintiffs sued. They claimed the Act violated their First and Fourteenth Amendment rights to expressive association, free speech, religious autonomy, religious exercise, and due process. JA48-61. Plaintiffs argued the Act forces them to employ people who reject their beliefs and cannot credibly promote their message. JA42-43. They also said the Act required them to include in their employee handbooks messages that contradict their pro-life beliefs. JA50-51, JA55. Respondents Governor Kathy Hochul, Labor Commissioner Roberta Reardon, and Attorney General Letitia James, state officials charged with enforcing the Act, JA40-42, moved to dismiss, JA108.

The trial court dismissed all but one claim. It dismissed the religion, waiver, and vagueness claims for reasons like those identified in *Slattery v. Hochul*, 61 F.4th 278, 291-95 (2d Cir. 2023). But the court also held Plaintiffs failed to state an expressive association claim because while Plaintiffs engage in "expressive activity," JA134, they suffer no harm by deploying advocates who cannot credibly communicate those beliefs. JA137-41. Sure, Plaintiffs may not "practice[ ] what they preach[ ]," and people will call them "hypocrites," the court said, but this is no "significant limitation" on Plaintiffs' right to "speak and associate." JA141. This fault is inescapable: people expect it in today's "culture." JA141. And everyone will know the State has coerced them anyway. JA141. The court

12

then upheld the Act under rational-basis scrutiny. JA142. This logic is incorrect given that *Slattery* rejected it, 61 F.4th at 287.

Only the speech claim survived. And the trial court issued Plaintiffs summary judgment on it. JA387-410. It held that N.Y. Lab. Law § 203-e(6) forces Plaintiffs *in their employee handbook* to promote abortion and tell employees they can violate Plaintiffs' policies without consequences. JA405-06. Where Plaintiffs seek to convey workplace rules, organizational values, and their faith, the Act forces them to "promote" another "message"—one "contrary to their values." JA406. That rule is too intrusive. So the court held the Act compels speech based on content, and that the rule fails strict scrutiny because it's not narrowly tailored to achieve the State's goal. JA407-10. The State has other ways to advertise the law without requiring Plaintiffs to promote content they oppose in their own branded resources. JA409. It need not coerce Plaintiffs' speech.

Senior U.S. District Judge Thomas J. McAvoy entered final judgment three days later. JA411. Plaintiffs timely appealed, JA413, contesting the trial court's early dismissal of their claims, *CompassCare v. Cuomo*, 465 F. Supp. 3d 122 (N.D.N.Y. 2020). New York cross-appealed, JA416, challenging summary judgment for Plaintiffs on the speech claim, *CompassCare v. Cuomo*, 594 F. Supp. 3d 515 (N.D.N.Y. 2022). On appeal, this case was stayed pending the panel ruling in *Slattery*. The Court decided that case in February, prompting this appeal to proceed.

## ARGUMENT SUMMARY

The Act violates Plaintiffs' constitutional rights. For starters, the First Amendment protects the right to associate to engage in expressive activities. This freedom ensures that Americans can join up to promote diverse views. It protects people from all backgrounds. And it presupposes the freedom not to associate. The Act violates this principle—forcing Plaintiffs to employ those who cannot credibly promote their message. For Plaintiffs, the messenger is the message. Employing those who reject their beliefs will mute their mission and message.

Second, the Act compels and restricts speech. Not only does it force Plaintiffs to employ those who cannot credibly promote their message, it forces them to promote the Act in their employee handbook. The Act forces Plaintiffs to advertise its unconstitutional application to them. Then it forbids Plaintiffs from requiring employees to sign documents waiving their right to sue under the Act. This keeps Plaintiffs from avoiding costly lawsuits and facing the Act's stiff penalties—damages awards, injunctions, attorney fees and more. And it regulates this protected speech based on content and viewpoint, triggering strict scrutiny.

Third, the Act violates free exercise. It targets people of faith. As one lawmaker said, the Act stops religious employers from using personal beliefs to "encroach" on employees' reproductive decisions, which in turn will curtail "dangerous" religious freedom precedents. Worse, it intrudes on historically protected religious exercise, forcing religious nonprofits to

14

employ those who reject their beliefs. And the Act lacks general applicability. Only employers who publish "an employee handbook" must notify their team about what the Act requires. Others do not.

These applications trigger at least strict scrutiny. New York must prove the Act is narrowly drawn to advance a compelling state interest. It has not done that; nor could it in a dismissal. While the State says the Act must prevent discrimination, ensure privacy, and protect reproductive health decisions, it has not shown these are real problems. Nor would these broad interests suffice anyway. Because the Act alters Plaintiffs' message, these interests cannot override their expressive freedom. Likewise for the handbook rule, the Act is both underinclusive and overinclusive—exempting wide swaths of employers while using unnecessarily intrusive means. The Act fails strict scrutiny as applied.

Plaintiffs plausibly allege all these claims. What's more, they show they deserve an injunction. Plaintiffs will likely succeed on the merits. And every day they face First Amendment injury, Plaintiffs also risk costly lawsuits, damages, attorney fees, and more. The public loses too. New York has no interest in enforcing unconstitutional laws. And because no further record development is needed, this Court should reverse the dismissal below and preliminarily enjoin the Act as applied. Plaintiffs have waited long enough to enjoy their freedom without fear of state reprisal.

# ARGUMENT

Plaintiffs plausibly allege and will likely succeed in showing the Act violates their constitutional rights. This Court should reverse the dismissal below and preliminarily enjoin the Act as applied.

## I.  Standard of Review

This Court reviews Rule 12(b)(6) dismissals *de novo*, "accepting as true all" facts in the complaint "and drawing all reasonable inferences in the plaintiff's favor." *Slattery*, 61 F.4th at 285-86 (citing *Henry v. County of Nassau*, 6 F.4th 324, 328 (2d Cir. 2021)).

The Court reviews preliminary-injunction denials for an abuse of discretion. *A.H. v. French*, 985 F.3d 165, 175 (2d Cir. 2021). This occurs when a decision rests on legal error, clearly wrong facts, or is invalid. *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 99 (2d Cir. 2012).

## II.  Plaintiffs plausibly allege the Act violates their constitutional rights and deserve a preliminary injunction.

To avoid dismissal, Plaintiffs need only allege "plausible grounds" showing they deserve relief. *Slattery*, 61 F.4th at 286. For the injunction, Plaintiffs must show they will likely succeed on the merits, they will likely suffer irreparable harm, the equities favor them, and the injunction is in the public interest. *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). Plaintiffs plausibly allege that the Act violates their constitutional rights, and this Court should enter the requested injunction.

### A.   Plaintiffs plausibly allege and will likely succeed in showing the Act compels expressive association.

The First Amendment protects the "right to associate" to engage in expressive activities. *Slattery*, 61 F.4th at 286 (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984)). This freedom ensures that Americans can band together to pursue "a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* (citing *Roberts*, 468 U.S. at 622). It protects everyone—thought leaders and thought provokers. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). And it "presupposes a freedom not to associate"—for nothing stops fierce advocacy more than forcing a group "to accept members it does not desire." *Slattery*, 61 F.4th at 286-87 (citing *Roberts*, 468 U.S. at 622-23).

This freedom allows America to flourish. And the Supreme Court has given a three-part test to sniff out efforts to stifle it. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000). Courts first ask whether a group is "engaged in expressive association." *Slattery*, 61 F.4th at 287. Then they examine whether government has "significantly affected the group's ability to advocate its viewpoints." *Id.* And third, courts weigh the government's interest against the burden on the group. *Id.* If the burden is "severe," courts apply "strict scrutiny," requiring the government to show that the burden "is narrowly drawn to advance a compelling state interest." *Id.* (citing *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 191 (2d Cir. 2017)). The Act fails this test as applied to Plaintiffs.

17

### 1.  Plaintiffs join with others to speak.

Plaintiffs engage in expressive association. They join with others "to advocate" religious and pro-life "viewpoints." *Dale*, 530 U.S. at 648. CompassCare does this when it meets with clients, provides pregnancy tips, and encourages mothers to choose life for their unborn child. JA26-27. The group likewise speaks when it shares the Gospel, pens blogs, and airs radio ads promoting its pro-life views. JA29-30. NIFLA jointly speaks when it supports a network of pregnancy centers dedicated to seeing an abortion-free America, provides them legal counsel, and teaches them how to save unborn lives. JA31. First Bible likewise jointly speaks when it preaches the Gospel, teaches its faith, supports pregnancy care centers, and engages in Christian mission. JA33-35. The court below agreed, holding that Plaintiffs join with others to promote life and pass their faith to those they serve. JA134. That satisfies part one. JA134.

### 2.  The Act significantly affects Plaintiffs' ability to promote their message.

The Act "significantly affects" Plaintiffs' ability to promote their religious and pro-life views. Plaintiffs join with others to share the Gospel and promote a lifesaving message. JA21, JA25-34. The Act thwarts this mission. It compels Plaintiffs to join with employees who reject their views. JA42-43. That alters Plaintiffs' message by requiring them to employ those who cannot credibly promote it. JA29-32. The Act would force CompassCare and NIFLA to counsel women considering abortion with

dissenting team members who insist on personally choosing abortion, using abortifacient drugs, or advocating positions contrary to Plaintiffs' beliefs. And it would force First Bible to deploy teachers who reject its biblical beliefs. This coercion severely weakens Plaintiffs' message.

While courts should "give deference to an association's view of what would impair its expression," *Dale*, 530 U.S. at 653, the court below held that Plaintiffs overplayed the Act's "interference." JA137. It did so despite acknowledging the Act would force Plaintiffs "to associate with employees whose actions" show "they do not share [Plaintiffs'] views." JA139 (cleaned up). The court said, while Plaintiffs may not "practice[ ] what they preach[ ]," and people will call them "hypocrites," this is no "significant limitation" on Plaintiffs' right to "associate," JA141; it's an "incidental" burden at best. JA140. But as this Court holds, that's a severe burden. *Slattery*, 61 F.4th at 287. It highly impairs Plaintiffs' ability "to express only those views that brought them together." *Id.*

This case resembles not only *Slattery*, but *New Hope Family Services, Inc. v. Poole*, 966 F.3d 145, 179 (2d Cir. 2020). In *New Hope*, a private Christian adoption ministry could not recommend "adoption by unmarried or same-sex couples because it [did] not think such placements are in the best interests of a child." 966 F.3d at 149. The government said this policy violated state law and forced the ministry to comply or shut down. *Id.* New Hope sued, claiming the law violated its right to expres-

19

sive association by forcing it to both "include [certain] couples in its comprehensive evaluation, training, and placement programs and adoptive-parent profiles," and "correct or discipline employees" who share New Hope's beliefs with others. *Id.* at 149, 178-79 (cleaned up). This was no "slight impairment," this Court held. *Id.* at 179. The law significantly affected the group's ability to "advocate" its "viewpoints." *Id.*

So too here. The Act forces Plaintiffs "to employ individuals who act or have acted against" their "mission." *Slattery*, 61 F.4th at 288. Plaintiffs employ only those who can credibly promote their religious and pro-life message. JA55. This is Plaintiffs' "right." *Slattery*, 61 F.4th at 288. To decide whether someone fits this criterion, Plaintiffs consider whether they engage in conduct that will undermine the organization's message. Whether employees abort children, use abortifacient drugs, or reject biblical sexual ethics will affect Plaintiffs' message. JA42-43. The Act forbids these considerations, foreclosing Plaintiffs' ability to employ only those who can credibly promote their views. JA42-43. This alters Plaintiffs' message, "severely" burdening their "freedom of expressive association." *Slattery*, 61 F.4th at 288 (citing *Roberts*, 468 U.S. at 622).

The messenger matters. Imagine forcing Democrats to hire Republicans, PETA to hire meatpackers, Greenpeace to hire coal miners, and Win Without War to hire a war criminal—all as strategists or marketers to promote and speak the groups' message. New memes would trend. The groups' credibility would suffer. And their message would fail. As lawyers

know well, a messenger's credibility critically affects their message. Imagine a court preventing defense counsel from testing the credibility of the state's star witness. Besides defying the law, *see Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986), this would suppress critical facts about the accused's culpability—a key message of the trial.

Finally, it's no answer to say people will know Plaintiffs are only doing "what the State requires." JA141. That logic "could always justify … forcing an association to accept members it does not desire." *Slattery*, 61 F.4th at 290. And it "devalues" Plaintiffs' "interest in expressive association." *Id.* It's too blunt. The law must distinguish, for example, between requiring drug reformers "to comply with laws prohibiting" drug sales "and requiring [them] to admit anti-drug crusaders to" their ranks. *Id.* (citing Richard W. Garnett, *Jaycees Reconsidered: Judge Richard S. Arnold & the Freedom of Association*, 58 Ark. L. Rev. 587, 606 (2005)). Otherwise, states could crush undesired speech, *id.*, as the Act threatens to do here. That severely burdens Plaintiffs' expression. *Id.* at 288. So strict scrutiny applies. *Id.* at 289. And part two is satisfied.

### 3. The Act fails strict scrutiny as applied.

To pass strict scrutiny, New York must prove the Act is narrowly drawn to advance a compelling state interest. *Slattery*, 61 F.4th at 289 (citing *Roberts*, 468 U.S. at 623); *but see id.* at n.2 (suggesting that once the infringement of expressive association is shown, "the party asserting

21

the right will win, unless the government can assert the type of truly compelling interest that (almost never) trumps First Amendment rights in other contexts" (citing David E. Bernstein, *The Right of Expressive Association & Private Universities' Racial Preferences & Speech Codes*, 9 Wm. & Mary Bill Rts. J. 619, 625 (2001)). It's often too early to decide this issue; courts typically "wait until" a later stage. *Id.* at 289; *Cornelio v. Connecticut*, 32 F.4th 160, 168 (2d Cir. 2022). But the Act fails even at *this stage*.

The Act advances no compelling interest. Marshaling more than "anecdote and supposition," New York must prove the Act solves an "actual problem." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822 (2000). It does not do so. Nor could it. *Slattery*, 61 F.4th at 289; *Cornelio*, 32 F.4th at 168. The Act's main sponsor cited *no* instance of employment discrimination based on reproductive health decisions in New York or anywhere else. JA36-37. Sure, other states have passed similar laws. JA37-40. But those parallel enactments appear just as baseless as New York's. JA37-40. The State shows only a bare supposition that it can punish (notional) discrimination to support the Act. JA36-37. That's not nearly enough.

The State cannot so easily justify its coercion anyway. The question "is not whether the [State] has a compelling interest in enforcing its non-discrimination [law] generally, but whether it has such an interest in" coercing Plaintiffs specifically. *Fulton v. City of Philadelphia*, 141 S. Ct.

1868, 1881 (2021). Because the Act blurs Plaintiffs' message, it requires much higher justification. *Hurley v. Irish Am. Gay, Lesbian, & Bisexual Grp. of Bos.*, 515 U.S. 557, 577-78 (1995); *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 792 (9th Cir. 2022) (rejecting rule forcing pageant to cast person altering its message). New York's nondiscrimination interest can't override Plaintiffs' expressive freedom. *Dale*, 530 U.S. 658-59.

What's more, even if New York's interest in ensuring employees can make reproductive health choices free from consequences could be disentangled from its nondiscrimination interest, "broadly formulated interests" do not suffice. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). And "[m]ere speculation" is insufficient. *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543 (1980). Nothing suggests that people are losing jobs over their reproductive health choices. Because the Act targets no real problem, *Playboy*, 529 U.S. at 822, it serves no compelling interest, *e.g. Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 822 (E.D. Mo. 2018) (notional discrimination worries insufficient to show compelling interest in coercing pro-life nonprofit's expressive association).

If the "recited harms" were "real," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994), the State would have required all employers to advertise the Act, not just those with employee handbooks, *see Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546-47 (1993)

23

(no compelling interest where law "leaves appreciable damage" to "supposedly vital interest unprohibited"); *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (similar). That would be "necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). But the State refused: it could identify no problem needing a solution. *Id.* New York cannot justify coercing Plaintiffs' expressive association.

The Act also lacks narrow tailoring. A law is narrowly tailored only if it applies "the least restrictive means" to achieve its goal. *Slattery*, 61 F.4th at 289. The Act is overkill—covering all employers no matter their form or mission. *Id.* Here, Plaintiffs "advocate against" precisely what the Act condones. *Id.* By allowing Plaintiffs to continue their mission the Act would provide "limited" relief where the Constitution requires it. *Id.* But if the Act could force Plaintiffs to employ unfit messengers, their mission would fail. *Id.* at 289-90. How can "an organization … sincerely and effectively convey" its message against certain conduct if "it must accept members who engage in that conduct"? *Id.* at 290 (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006)). It can't, so the Act must give way to the First Amendment. *Id.* (balance of interests "favors the expressive association" here).

What's more, lawmakers knew the Act may fail under constitutional scrutiny. Knowing that the First Amendment protects religious employers, JA39-40, lawmakers did not exempt them. Those groups must instead pay for their freedom, defending themselves in court against

costly lawsuits seeking to subvert their mission. That's unjust. Worse, the Act is unnecessary. New York employment law already banned pregnancy discrimination. *See Union Free Sch. Dist. No. 6 of Towns of Islip & Smithtown v. N.Y. State Hum. Rts. Appeal Bd.*, 35 N.Y.2d 371, 375 (1974) (holding pregnancy discrimination covered by New York's Human Rights Law's prohibition on sex distinctions). And that law has a religious exemption. It had struck the right balance. Then New York passed the Act specially to punish those it cannot constitutionally coerce. That's wrong.

Because the Act is not narrowly drawn to advance a compelling state interest, it violates Plaintiffs' right to expressive association.

### B.   Plaintiffs plausibly allege and will likely succeed in showing the Act violates free speech as applied.

Plaintiffs plausibly allege and will likely succeed in showing the Act unlawfully compels and restricts their speech, regulates their speech based on content and viewpoint, and fails strict scrutiny.

### 1.   The Act compels Plaintiffs to speak.

The First Amendment protects "the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). This ensures that speakers may "choose the content of" their speech, *Hurley*, 515 U.S. at 573, and retain "control" over what they say, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

A compelled-speech claim has three elements: (1) speech, (2) that the government compels, and (3) the speaker opposes. *Hurley*, 515 U.S. at 572-73; *New Hope*, 966 F.3d at 171. Because Plaintiffs satisfy each element, strict scrutiny applies. *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.* (*PG&E*), 475 U.S. 1, 19 (1986) (plurality).

Plaintiffs allege that the Act compels them to speak two ways—requiring them to issue a notice expressing views they oppose, and to employ those who cannot credibly promote their message.

i.

First, the Act forces Plaintiffs to publish a notice in their employee handbook conveying messages they oppose. Plaintiffs' "words" are speech. *Kaplan v. California*, 413 U.S. 115, 119 (1973). The Act requires Plaintiffs to notify employees in their handbooks about their "rights and remedies" under the Act. N.Y. Lab. Law § 203-e(6). Exactly where Plaintiffs seek to convey their biblical and pro-life mission and beliefs, the Act requires them to promote the opposite message—that employees can procure abortions, use abortifacient drugs, and disregard biblical sexual ethics without consequence. Worse, the rule forces Plaintiffs to lie. Because the Act cannot force Plaintiffs to employ messengers who cannot credibly convey their message, § II.A, *supra*, suggesting that employees can violate their rules without consequence is false. This triggers strict scrutiny. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018)

(rejecting similar application forcing pregnancy centers to advertise abortion—"the very practice" they were "devoted to opposing").

ii.

Second, the Act forces Plaintiffs to employ messengers who cannot credibly convey their message. This also compels speech and triggers strict scrutiny. Unlike a sandwich shop, an automotive repair facility, or a nationwide retailer, Plaintiffs' employment choices inevitably affect their message. Just as film producers must be able to choose actors and newspapers must be able to choose writers who can credibly convey their message, Plaintiffs must also be free to select those who can credibly convey their message. *E.g.*, *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 962 (9th Cir. 2010); *Claybrooks v. Am. Broad. Cos., Inc.*, 898 F. Supp. 2d 986, 997, 999-1000 (M.D. Tenn. 2012). Otherwise, Plaintiffs' message and mission would fail. § II.A.2. While Plaintiffs acknowledge *Slattery* rejected this second argument, Plaintiffs preserve it for appeal.

### 2. The Act compels Plaintiffs' speech based on content and viewpoint.

Worse, the Act compels Plaintiffs' speech based on content and viewpoint. First, it compels Plaintiffs to promote views they would otherwise not, § II.B; this "necessarily alters the content of [their] speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988).

Second, the Act treats Plaintiffs' decision to speak through an employee handbook as the trigger for requiring the speech they oppose.

27

*Tornillo*, 418 U.S. at 256 (invalidating law that triggered newspaper's op-ed publication based on its printing prior criticism of candidate).

Third, the Act awards access to Plaintiffs' handbook only to the State—the very one who "disagree[s] with [Plaintiffs'] views." *PG&E*, 475 U.S. at 13 (rejecting law that forced company to open newsletter to hostile groups); *see Turner*, 512 U.S. at 654 (*PG&E* law viewpoint-based because it awarded "access only to [those] opposing" the company's view).

Fourth, the Act suppresses "particular views" the State disfavors. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It compels Plaintiffs to say employees who abort their children, use abortifacient drugs, or reject biblical sexual ethics will have no employment consequences. That's one view, but it's not theirs—it's the State's.

For all these reasons, Plaintiffs plausibly allege that the Act violates Plaintiffs' free-speech rights by compelling them to speak based on content and viewpoint.

### 3. The Act restricts Plaintiffs' speech based on content and viewpoint.

The Act also restricts Plaintiffs' speech. It forbids Plaintiffs from requiring employees to "sign a waiver or other document" that "purports to deny" them "the right to make their own reproductive health" decisions. N.Y. Lab. Law § 203-e(2)(b). Whether by handbook, pledge, or standalone waiver, Plaintiffs cannot ensure that their employees will both share and follow their beliefs. This rule restricts Plaintiffs' speech

because of its "message" and triggers strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 164-65 (2015). While Plaintiffs acknowledge *Slattery* also rejected this argument, Plaintiffs preserve it for appeal.

### 4. The Act fails strict scrutiny as applied.

The Act's broader coercion fails strict scrutiny. § II.A.3. And its notice rule fares no better. The rule serves no compelling interest. While New York says it must ensure that employees are not "misled about their rights," JA407, the rule is "substantially underinclusive" to promote this interest. *Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). The State never argues that employers with handbooks are more deceptive than those without. Nor does it show their workers are less informed. So the State never shows how employers without handbooks "pose a lesser risk" to its interest. *Tandon*, 141 S. Ct. at 1297. It says instead that Plaintiffs can avoid the rule by tossing their handbook. JA409. Because the notice rule isn't needed, it serves no compelling interest. § II.C.3.

The rule also lacks narrow tailoring. As the court below held, New York can achieve its goal better in less intrusive ways. JA409. It need not commandeer employee handbooks. Those resources convey an employer's values, mission, and beliefs. JA50-53. Employers use handbooks to convey details critical to achieving their organizational goals. While those handbooks may be enviable messengers, New York has better options.

Precedent proves it. The State typically conveys workplace notices through wall décor, pamphlets, or other advertising. JA410. If those methods suffice to notify workers about other employment laws, they also suffice here. The State need not preempt employee handbooks—and certainly not to require Plaintiffs to say the law may coerce them in ways the constitution forbids. The notice rule fails strict scrutiny.

### C. Plaintiffs plausibly allege and will likely succeed in showing the Act violates free religious exercise.

The First Amendment also ensures people can freely exercise their faith. U.S. Const. amend. I. While laws that are neutral and generally applicable sometimes trigger minimal scrutiny, *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878-79 (1990), laws that lack these features require strict scrutiny or are per se invalid. *Lukumi*, 508 U.S. at 531 (strict scrutiny); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018) (per se rule). Because the Act is not neutral or generally applicable, it triggers at least strict scrutiny.

### 1. The Act unjustly intrudes on historically protected religious exercise.

By forcing Plaintiffs to violate their sincere religious beliefs and employ those who cannot credibly promote their faith, the Act "burden[s] [their] sincere religious practice." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421-22 (2022); § II.A. Forcing religious groups to choose between "curtailing [their] mission" or partnering with those who reject

their beliefs plainly burdens their religious exercise. *Fulton*, 141 S. Ct. at 1876. This coercion violates Plaintiffs' rights without balancing interests, *Smith*, 494 U.S. at 877 (recognizing protected exercise).

## 2. The Act targets people of faith.

The Act also lacks neutrality. It was fueled by hostility toward people of faith, evidenced by the fact that New York law already prohibited pregnancy discrimination, appropriately paired with a statutory religious exemption. The *only* reason to pass the Act was to work around the religious exemption and restrict employer decisions "because of their religious motivation." *Lukumi*, 508 U.S. at 533. As one lawmaker candidly admitted, the Act aims to stop people of faith from using "personal beliefs" to "encroach[ ]" on employees' reproductive choices, JA19, JA122, which will curtail "dangerous" religious freedom decisions like *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). JA19. That's religious targeting.

This logic permeated the official record, which for example nonsensically vilified religious-employer challenges to the ACA as attempts to deny employees health care. JA19, JA38-39. Lawmakers suggested the Act was needed to close "legal loopholes" ensuring that religious employers must employ those who reject their beliefs on "pregnancy, contraception, and reproductive health." JA36. Worse, lawmakers knew the Act may unconstitutionally apply to religious employers, JA40, yet refused to

31

exempt them—forcing those employers to defend themselves in court whenever employees seek to subvert their mission. Because laws that target "religious beliefs" are "never permissible," *Lukumi*, 508 U.S. at 533, the Act is per se invalid, *see Masterpiece*, 138 S. Ct. at 1732.

While Plaintiffs acknowledge the Court rejected this argument in *Slattery*, Plaintiffs preserve it here for appeal. 61 F.4th at 292-94.

### 3.     The Act is not generally applicable.

The Act is also not generally applicable. Its notice rule does not apply to all employers. Only those with "an employee handbook" must notify their team about what the Act requires. N.Y. Lab. Law § 203-e(6). Employers without a handbook need provide no notice. This "individualized exemption[ ]" triggers strict scrutiny. *Fulton*, 141 S. Ct. at 1877; *Lukumi*, 508 U.S. at 537. While New York says it must notify workers about the Act, the rule is substantially underinclusive to promote that interest. § II.B.4. Because its broad exemption threatens New York's interest to a "greater degree than" Plaintiffs' religious exercise, the Act cannot punish Plaintiffs for obeying their faith. *Lukumi*, 508 U.S. at 543.

### 4.     The Act fails strict scrutiny.

Because the Act unjustly intrudes on historically protected religious exercise, targets people of faith, and is not generally applicable, strict scrutiny applies, and the Act's notice rule fails to satisfy that high standard.

A law will fail strict scrutiny unless the government shows it is necessary to achieve an interest "of the highest order." *Fulton*, 141 S. Ct. at 1881. If New York "can achieve its interests" through means that do not "burden religion, it must do so." *Id.* Here it can. If the State's interest is safe when employers without handbooks provide zero notice of the Act, it will remain so when allowing three religious groups to obey their faith. § II.B.4, *supra*.

Because the Act intrudes on historically protected religious exercise, targets people of faith, lacks general applicability, and fails strict scrutiny, the Act violates free exercise.

### D. The remaining injunction factors favor Plaintiffs.

The loss of First Amendment rights "for even minimal periods" of time imposes "irreparable injury." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996); *accord Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000). So here, "the likelihood of success on the merits is the dominant" or even "dispositive" factor. *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Plaintiffs have made that showing. §§ I.A-C. But the balance of equities strongly favors them anyway.

 The Act imminently threatens Plaintiffs' mission and message. Plaintiffs seek to promote their religious and pro-life views. But the Act forces them to employ messengers who reject their beliefs and cannot credibly promote their beliefs. This threatens far more than Plaintiffs'

"reputation," *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); it exposes them to costly lawsuits, damages, attorney fees, and more—which could shutter the ministries for good. Plaintiffs have most to lose here.

The public interest also favors entering the injunction. "[S]ecuring First Amendment rights is in the public interest." *Walsh*, 733 F.3d at 488. *See also PG&E*, 475 U.S. at 8 (recognizing "societal interests" in "free speech"). New York has no interest in enforcing unconstitutional laws. *Walsh*, 733 F.3d at 488. And New York can still enforce the Act against other employers—just not Plaintiffs. Plaintiffs meet their burden. They both state plausible claims and deserve an injunction.

## III.  This Court should order the requested injunction.

This Court may order a preliminary injunction when it has "enough solid facts [in] the record" to "render a decision." *English v. Town of Huntington*, 448 F.2d 319, 321 (2d Cir. 1971). This record provides those facts. Plaintiffs filed a verified complaint, attached exhibits, and provided more exhibits in their motion. JA17-107. This case also went through discovery. Both sides made a record and moved for summary judgment. JA184-386. This Court should issue the requested injunction. *E.g. Walsh*, 733 F.3d at 489. A "remand for reweighing would waste judicial resources and" cause unnecessary "delay." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 725 (3d Cir. 2004). Especially here, for three reasons.

First, on any later injunction appeal, this Court would "make an independent examination of the record … without deference to the factual findings" below. *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996). The record is complete. This Court can review it now.

Second, Plaintiffs' injunction arguments substantially overlap with whether they plausibly alleged constitutional claims.

Third, Plaintiffs' First Amendment injury "was both threatened and occurring" when they filed the complaint. *Elrod v. Burns*, 427 U.S. 347, 374 (1976) (plurality). Delaying injunctive relief would continue to harm Plaintiffs' constitutional interests. And it would force Plaintiffs to continue risking costly damages, attorney fees, and more.

Appellate courts regularly issue injunctions in the first instance when constitutional freedoms are at stake and no party disputes facts. *E.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (en banc) (resolving injunction factors in free exercise claim where "the government nowhere contested the [facts]"); *id.* at 1145 n.21 (collecting cases). Plaintiffs request that this Court do the same.

## CONCLUSION

Plaintiffs state plausible claims that warrant an injunction. They incur harm and risk costly lawsuits every day they're left unprotected. This Court should reverse the dismissal below and either enter the requested injunction itself or order the trial court to issue it on remand.

Respectfully submitted,

*/s/ Jacob P. Warner*

|  |  |
|---|---|
| KEVIN H. THERIOT | JOHN J. BURSCH |
| JACOB P. WARNER | ALLIANCE DEFENDING FREEDOM |
| ALLIANCE DEFENDING FREEDOM | 440 First Street NW, Ste. 600 |
| 15100 N. 90th Street | Washington, DC 20001 |
| Scottsdale, AZ 85260 | (616) 450-4235 |
| (480) 444-0020 | jbursch@ADFlegal.org |
| ktheriot@ADFlegal.org |  |
| jwarner@ADFlegal.org |  |

JAMES P. TRAINOR
TRAINOR LAW, PLLC
2452 US Route 9, Suite 203
Malta, NY 12020
(518) 899-9200
james@trainor-lawfirm.com

*Counsel for Appellants/Cross-Appellees*

April 6, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2023, this brief was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit through the Court's CM/ECF system. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Jacob P. Warner*
Jacob P. Warner

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rule 28.1.1(a) because, excluding the portions exempted by Fed. R. App. P. 32(f), this brief contains 8,067 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ Jacob P. Warner
Jacob P. Warner
*Counsel for Appellants/Cross-Appellees*

Dated: April 6, 2023